IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JEFFREY D. COTTRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-990C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

---

DEFENDANT'S APPENDIX
IN SUPPORT OF ITS MOTION TO DISMISS

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRYANT G. SNEE
Assistant Director

KELLY B. BLANK
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988

Attorneys for Defendant

Of Counsel:
STEVEN G. REED
Assistant Regional Attorney
Office of General Counsel
United States Department of Agriculture
Columbus, OH 43215

December 29, 2005

# INDEX TO APPENDIX


| Item | Page |
| --- | --- |
| CRP Application, dated July 17, 1989 | 1 |
| Letter to Jeffrey Cottrell from Loran Stutz, dated August 8, 1989 | 15 |
| Conservation Plan, dated September 5, 1989 | 16 |
| Minutes of Coshocton County Committee, dated September 6, 1989 | 17 |
| Letter to Jeffrey Cottrell from County Committee, dated October 4, 1989 | 18 |
| Letter to Jeffrey Cottrell from Loran Stutz, dated November 14, 1989 | 19 |
| Letter to Jeffrey Cottrell from Dorothy Leslie, dated November 22, 1989 | 20 |
| 1990 Price Support and Production Adjustment Programs Contract, dated April 11, 1990 | 22 |
| CRP Withdrawal Letter, dated March 15, 1990 | 23 |
| Letter to Bruce Malek, attorney, from Loran Stutz, dated March 29, 1990 | 25 |
| Letter to Curt Zimansky, attorney, from Loran Stutz, dated May 2, 1990 | 26 |
| Letter to Grady Pettigrew, Jr., attorney, from Dorothy Leslie, dated July 19, 1990 | 27 |
| Letter to William Adams, attorney, from Thomas Vongarlem, dated March 3, 1991 | 29 |
| Opinion and Order of the United States District Court, dated November 15, 1991 | 32 |
| Minutes of Coshocton County Committee, dated November 5, 1997 | 42 |
| Letter to Nancy Cottrell from Michael Jacob, dated November 6, 1997 | 44 |
| Table of CRP Signup Periods, dated May 1, 2003 | 46 |
| Production Flexibility Contract, dated September 17, 2001 | 47 |

Memorandum to the County Committee from State Executive Director, dated January 9, 2002 53

Excerpts from Payment Records, dated January 11, 2002 54

Form Approved - OMB No. 0560-0125

CRP-1
(02-21-86)

U.S. DEPARTMENT OF AGRICULTURE
Agricultural Stabilization and Conservation Service
Commodity Credit Corporation

# CONSERVATION RESERVE PROGRAM CONTRACT

1. ST. & CO. CODE & C/D: 39-031-1
2. CONTRACT NO.
3. FARM NO.: 2251

**NOTE:** *The following statements are made in accordance with the Privacy Act of 1974 (5 USC 552a): The authority for requesting the information to be supplied on this form is the Food Security Act of 1985, P.L. 99-198, and the regulations promulgated thereunder (7 CFR Part 704) and the Internal Revenue Code (26 USC 6109). The information requested is necessary for CCC to consider and process the offer to enter into a Conservation Reserve Program Contract, to assist in determining eligibility, and to determine the correct parties to the contract. The information may be furnished to other USDA agencies, IRS, Department of Justice, or other State and Federal law enforcement agencies, and in response to orders of a court, magistrate, or administrative tribunal. Furnishing of the Social Security Number (SSN) is mandatory. Furnishing all other information is voluntary; however, failure to furnish the correct, complete information requested will result in rejection of the offer to enter into the contract.*

THIS CONTRACT is entered into between the Commodity Credit Corporation (referred to as "CCC") and the undersigned owners and operators (referred to as "Owner" and "Operator", respectively) on the farm identified above (referred to as "Farm") for the fields and acres (referred to as "designated acreage") identified in Items 8-17 below and on the CRP-1A Addendum, as applicable. The Owner and Operator agree to place the designated acreage into the Conservation Reserve Program ("CRP") for a period of 10 crop years from the date the Contract is executed by the CCC. The Owner and Operator also agree to implement on such designated acreage the Conservation Plan developed for such designated acreage and approved by the applicable local conservation district based upon the conservation practices identified in Items 10 and 15 below and in Items 4 and 9 on the CRP-1A Addendum or such other conservation practices as are identified in the Conservation Plan and agreed to by the Owner and Operator. The Owner and Operator and CCC agree to comply with the terms and conditions contained in this Contract and contained in the Appendix to this Contract, entitled Appendix to CRP-1, Conservation Reserve Program Contract (referred to as "Appendix"). By signing below, each Owner and Operator acknowledges that a copy of the Appendix has been provided to the Owner and Operator and that the Owner and Operator has signed the last page of such Appendix which will be kept on file in the County Agricultural Stabilization and Conservation Service (ASCS) Office. By signing below, the Owner and Operator also agree to allow CCC a period of 30 days from the close of the applicable signup period to accept this Contract and agree to pay liquidated damages in an amount specified in the Appendix if the Owner and Operator do not allow CCC such 30-day period in which to execute this Contract.

## 4. OWNERS AND OPERATORS

| | NAME AND ADDRESS | SHARE | SSN / SIGNATURE | DATE |
|---|---|---|---|---|
| A. | OPERATOR NAME AND ADDRESS: Jeffrey Cottrell, 34395 CR 402, Warsaw OH 43844 | 100% | SSN: 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; SIGNATURE: [signature] | 7/17/89 |
| B. | OWNER NAME AND ADDRESS: Lucille Stuller, 7730 Newark Rd, Mt. Vernon OH 43050 | 0 % | SSN: 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; SIGNATURE: Lucille Stuller | 7/17/89 |
| C. | NAME AND ADDRESS | % | SSN / SIGNATURE | DATE |
| D. | NAME AND ADDRESS | % | SSN / SIGNATURE | DATE |

| 5. ACRES FOR CRP | 6. RENTAL RATE PER ACRE | 7. CONTRACT PERIOD FROM | TO |
|---|---|---|---|
| 450 Ac. | $ 65.00 | 1990 | 1999 |

| TRACT NO. (8) | FIELD NO. (9) | PRACTICE NO. (10) | ACRES (11) | RATE OF COST-SHARES (12) | TRACT NO. (13) | FIELD NO. (14) | PRACTICE NO. (15) | ACRES (16) | RATE OF COST-SHARES (17) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| 18. ANNUAL PAYMENT | 19. CCC USE ONLY - *Payments according to the shares are approved.* | CCC REPRESENTATIVE'S SIGNATURE | DATE |
|---|---|---|---|
| | | 1 | |

184

ORIGINAL - COUNTY OFFICE COPY

CRP-1 (Appendix)
(02-02-89)

Form Approved OMB No. 0560-0125

U. S. DEPARTMENT OF AGRICULTURE
Commodity Credit Corporation

# APPENDIX TO FORM CRP-1
# CONSERVATION RESERVE PROGRAM CONTRACT

## 1 DEFINITIONS

The following definitions are applicable to the CRP contract.

A **Agricultural commodity** means any crop planted and produced by annual tilling of the soil or on an annual basis by one-trip planters, or sugar cane planted or produced, or alfalfa and other multi-year legumes and grasses grown in a rotation with another agricultural commodity as approved by the Secretary.

B **Annual rental payment** means the per acre amount specified in item 6 on Form CRP-1 multiplied by the number of accepted acres, which may be paid to a participant to compensate such participant for placing eligible cropland in the Conservation Reserve Program.

C **CCC** means the Commodity Credit Corporation, a wholly-owned governmental corporation within the U.S. Department of Agriculture.

D **CFR** means the Code of Federal Regulations.

E **Commodity Certificates** means a farm program payment in a form other than cash to producers who are otherwise eligible to receive a cash payment from CCC, made in accordance with the provisions of 7 CFR Part 770.

F **Conservation District (CD)** means a subdivision of a State organized pursuant to the applicable State Soil Conservation District Law or in instances where a conservation district does not exist, the State Conservationist of the Soil Conservation Service.

G **Conservation plan** means the plan bearing the same contract number as this contract and applicable to the land placed in the Conservation Reserve Program by the participant describing the conservation practices which must be established on the land placed in the Conservation Reserve Program in order for either erosion on such land to be adequately controlled and/or for water quality to be sufficiently improved. The conservation plan includes Form SCS-CPA-11 and any addenda thereto. The conservation plan must list the approved vegetative cover and required conservation practices necessary for the establishment and maintenance of such vegetative cover.

H **Contract** means Forms CRP-1, CRP-1A (Addendum), CRP-1 (Appendix); CRP-1B (Addendum), CRP-15, the applicable conservation plan, and any addenda to these documents entered into in writing between the CCC and the participant which set forth terms and conditions for participation in the CRP.

I **County committee (COC)** means the County Agricultural Stabilization and Conservation Committee for the county in which the farm is administratively located.

J **Cost-share payment** means the payment provided by the Department to assist the participant in establishing the conservation practices required by this contract.

K **CRP** means the Conservation Reserve Program established in accordance with 7 CFR Part 704.

L **CRP land** means land subject to the terms and conditions of the CRP contract.

M **Cropland** see eligible cropland.

682

N **Current agricultural market value** means the amount in dollars, per acre, determined to be the price at which the land placed in the CRP could be sold for use as farmland at the time at which this contract is signed by the participant.

O **Department** means the U. S. Department of Agriculture and includes CCC.

P **Eligible cropland** means land which meets the eligibility requirements of paragraph 2 of this contract.

Q **Farm** means all land which is constituted as the farm in accordance with the regulations governing the constitution and reconstitution of farms found at 7 CFR Part 719.

R **Farm acreage base** means the total acreage base for all crops on the farm as determined by CCC in accordance with 7 CFR Part 713, or other applicable regulations adjusted to reflect any determination made with respect to such bases in accordance with 7 CFR Part 780.

S **Field** means a part or whole of a farm which is separated from the balance of the farm or other land by permanent boundaries such as fences, roads, permanent waterways, woodlands, croplines (in cases where the predominantly eligible cropland and farming practices make the part of the farm a manageable unit and probable that such cropline is not subject to change during the duration of the contract) or other similar features. However, notwithstanding the preceding sentence, an area placed in the CRP as a "filter strip" may be treated as a field for purposes of this contract.

T **Filter Strips** means an area of permanent vegetative cover that is 1.0 to 1.5 chain lengths (66 to 99 feet) in width, provided, that such width may be exceeded to the extent necessary to meet SCS Field Office Technical Guide criteria.

U **Local ASCS office** means the county office of the Agricultural Stabilization and Conservation Service serving the county or a combination of counties to which the owner and/or operator's farm or ranch is assigned for administrative purposes.

V **Manageable unit** means a part of a field that could be farmed in a normal manner as a self-contained unit.

W **Operator** means a person who is in general control of operations on the farm.

X **Owner** means a person who has legal ownership of farmland including a person who is buying farmland under a contract for deed.

Y **Participant** means an owner or operator or other person who has, subject to all terms and conditions of this contract including the provisions regarding eligibility for payments set out in paragraph 2, entered into this contract with CCC.

Z **Person** means an individual, joint stock company, partnership, association, corporation, estate or trust, or other business enterprise or other legal entity and, whenever applicable, a State, a political subdivision of a State, or any agency thereof; except that two or more individuals and entities may be combined as one person in accordance with the regulations found at (1) 7 CFR Part 795 and 1497, as applicable, for administering maximum payment limitations, (2) 7 CFR Part 796 for administering prohibitions on controlled substances, and (3) the regulations promulgated in accordance with Title XII of the Food Security Act of 1985.

AA **Producer** means a person who as owner, landlord, tenant, or sharecropper would have shared in the risk of producing the crop on the land to be placed in the CRP (or shares in the proceeds therefrom).

BB **SCS** means the Soil Conservation Service, an agency of the U.S. Department of Agriculture.

CC **Secretary** means the Secretary of the U.S. Department of Agriculture.

DD **Soil loss tolerance (T)** means the maximum average annual soil loss specified for a soil in the SCS technical guide available in local SCS offices and is the level of soil loss that may occur and still permit a high level of crop productivity to be obtained economically and indefinitely.

EE **Technical assistance** means the assistance provided to owners or operators by a representative of the Department in classifying cropland, developing conservation plans, inspecting eligibility of a designated area, and implementing and certifying conservation practices.

FF **Tree planting plan** means the plan that sets forth the silvicultural treatment necessary for planting trees, in order to obtain adequate erosion control on eligible cropland. The plan shall include site location, number of acres, requirements for site preparation, tree species and specifications, planting dates, pre- and post-care of nursery stock, and maintenance to ensure survival and shall be part of the conservation plan.

GG **Vegetative cover** means perennial or permanent grasses, legumes, forbs, and shrubs with a lifespan of 5 years or more, or trees.

HH **Wetland** means land which in its natural state, as determined by the Soil Conservation Service, has a predominance of hydric soil and that is inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions, except that this term does not include lands in Alaska identified as having a high potential for agricultural development and a predominance of permafrost soils.

II All other words and phrases, unless the context of subject matter otherwise requires, have the meanings assigned to them in the regulations governing the Conservation Reserve Program and the reconstitution of farms, allotments and bases, which are found at 7 CFR Part 704 and Part 719, respectively.

## 2 *ELIGIBILITY REQUIREMENTS; RESTRICTIONS ON PAYMENTS TO FOREIGN PERSONS*

A In order for any person to be eligible for payments under this contract, the person must be an owner or operator of eligible cropland and:

(1) If an operator of eligible cropland, must have operated the cropland for the period beginning not less than 3 years prior to the close of the applicable period for entering into the CRP contract with CCC or January 1, 1985, whichever is later, and must provide satisfactory evidence that the person will operate the cropland for the contract period; or

(2) If an owner of eligible cropland, must have owned the cropland for not less than 3 years prior to the close of the applicable period for entering into the CRP contract with CCC, unless:

(a) The owner acquired the cropland by will or succession as a result of the death of the previous owners;

(b) The owner acquired the cropland prior to January 1, 1985; or

(c) The Secretary determines that the land was acquired under circumstances that give adequate assurance that the land was not acquired for the purpose of placing it in the CRP.

B The participant certifies by signing the contract that the participant will control the land for the contract period and shall, upon demand, provide evidence to the CCC demonstrating that the participant will control the land for that period.

C In order to be eligible to be placed in the CRP, land must --

(1) Not have been included in a previously approved contract withdrawn, canceled or terminated except:

(a) For contracts approved in signups 1 through 4 (i.e., those contracts entered into in connection with CRP sign-up periods that closed prior to February 27, 1987) where the withdrawal was agreed to by CCC; or

(b) To the extent that a new contract is permitted for a successor-in-interest, pursuant to the provisions of paragraph 21.

(2) Have been annually planted or considered planted to produce an agricultural commodity other than orchards, vineyards, or ornamental plantings in 2 of the 5 crop years, 1981 through 1985;

(3) Be physically possible to be planted to produce an agricultural commodity other than orchards, vineyards, or ornamental plantings;

(4) Be a manageable unit which meets the minimum acreage requirements established by CCC for the county; and



L84

(5) Be comprised of a field or fields that consist predominantly of soils:

(a) Classified by SCS as Land Capability Classes II, III, IV, or V with an average annual erosion rate of 2T or greater, as announced by the Secretary; or

(b) Classified by SCS as being Land Capability Classes VI, VII, or VIII; or

(c) Which are both:

(1) Identified as highly erodible in accordance with 7 CFR Part 704.8; and

(2) Identified as having an erosion rate during the crop years 1981 through 1985, greater than that recommended by the SCS Field Office Technical Guide.

D For purposes of paragraph 2C(5), a field will be considered to be predominantly highly erodible if 66 2/3 percent or more of the land in such field meets the requirements of paragraph 2C(5); except that a field on which the participant agrees to plant trees may, as determined necessary by CCC, be considered to be predominantly highly erodible if 33 1/3 percent or more of the land in such field meets the applicable requirements of paragraph 2C(5).

E A field or area determined to be suitable for use as a filter strip may be eligible to be placed in the CRP, although it does not otherwise meet the requirements of paragraph 2 of this Appendix, if the participant agrees to grow permanent grass, forbs, shrubs or trees on such field or area. Such field or area may be considered to be suitable for use as a filter strip only if such land:

(1) Meets the requirements of 2C(1)-(3);

(2) Is located adjacent to a stream having perennial flow, other waterbody of permanent nature (such as lakes and ponds), or a seasonal stream, excluding such areas as gullies or sod waterways;

(3) Is capable of, when permanent grass, forbs, shrubs or trees are grown on the land, substantially reducing sediment that otherwise would be delivered to the adjacent stream or other waterbody; and,

(4) Is 1.0 to 1.5 chain lengths (66 to 99 feet) in width except, that such width may be exceeded to the extent necessary to meet SCS Field Office Technical Guide criteria.

F (1) A field or area having evidence of scour erosion caused by out-of-bank flows of water, as determined by SCS, or wetland areas may, as approved by CCC, be eligible to be placed in the CRP although the field does not meet the eligibility requirements of paragraph 2C(5).

(2) In order for land to be eligible for enrollment in the CRP under this paragraph F, such field or area must be cropland and must meet the requirements of 2C(1)-(3).

(3) In order for land to be eligible for enrollment in the CRP on the basis of scour erosion, the land at the time of enrollment in the program must be cropland which:

(a) Can be expected to flood a minimum of once every 10 years; and,

(b) Has suffered crop damage as a result of such scour erosion.

(4) To the extent practicable, only cropland areas of a field may be enrolled in the CRP under this paragraph F. If the full field is not eligible for enrollment, the quantity of cropland within the field which is eligible for enrollment shall be determined in accordance with subparagraphs F(5) and F(6). The entire cropland area of an eligible field may be enrolled in the CRP under this paragraph F if:

(a) The size of the field is 9 acres or less, or,

(b) More than 1/3 of the cropland in the field is either wetland or is land which, in the case of scour erosion, lies between the water source and the inland limit of the scour erosion.

(5) If under this paragraph F, the full field is not eligible for enrollment, that portion of the field which is eligible for enrollment:

(a) On the basis of scour erosion, shall be that portion of the cropland between the water body and the inland limit of the scour erosion; and,

(b) On the basis of the presence of wetlands, shall be only the wetland, except as provided in subparagraph F6.

(6) The area of a field deemed eligible for enrollment under this paragraph F, may be adjusted as necessary to establish manageable boundaries between the eligible and ineligible area of the field.

(7) If cropland is approved for enrollment in the CRP under this paragraph F, the eligible cropland shall be planted to an appropriate tree species approved by SCS unless tree planting is determined to be inappropriate by SCS in which case the eligible cropland shall be devoted to another acceptable permanent vegetative cover approved by SCS and the CCC.

G Land subject to a contract under the Great Plains Conservation Program, Agricultural Conservation Program, Forestry Incentives Program, Rural Clean Water Program, or similar program contract, or land currently under an annual program with maintenance or lifespan requirements, may be eligible to be placed in the CRP if the land meets the requirement of paragraphs 2C, 2E, or 2F and the conservation practices required to be established on such land by the conservation plan are consistent with the conservation requirements of the current program or contract.

H Privately-owned croplands, Indian tribal croplands, and State or local government croplands that otherwise meet the requirements of this paragraph are eligible to be placed in the CRP.

I Notwithstanding any other provision of this contract and subject to the provisions of 7 CFR Part 1498:

(1) Any person who enters into this contract after December 22, 1987 or participates in a contract entered into after that date and who is not a citizen of the United States or an alien lawfully admitted into the United States for permanent residence under the Immigration and Nationality Act (8 U.S.C. 1101 et. seq.) shall be ineligible to receive annual rental payments under this contract for the 1989 and 1990 crop years (i.e. payments that, subject to the availability of funds, would otherwise be due on or about October 1, 1990 and October 1, 1991) unless such person is an individual who is providing land, capital, and a substantial amount of personal labor in the production of crops on such farm. Payments not made by CCC pursuant to the preceding sentence shall not be due or payable under this contract.

(2) For the purposes of paragraph I(1), a corporation or other entity shall be considered a person that is ineligible for annual rental payments for the 1989 and 1990 crop years if more than 10 percent of the beneficial ownership of the entity is held by persons who are not citizens of the United States or aliens lawfully admitted into the United States for permanent residence under the Immigration and Nationality Act, unless such persons, as determined by CCC, provide a substantial amount of personal labor in the production of crops on such farm. However, if an entity is determined to be ineligible to receive a payment, CCC may make the payment in an amount determined by CCC to be representative of the percentage interests of the entity that is owned by citizens of the United States or aliens lawfully admitted into the United States for permanent residence under the Immigration and Nationality Act.

(3) All persons signing or succeeding to a CRP contract entered into by a participant after December 22, 1987, shall certify in writing to the CCC such facts as may be necessary to determine whether the restrictions on payments provided for in paragraph 2I of this Appendix apply and shall submit to the CCC such evidence as may be requested to determine the accuracy of such certification.

3 **AGREEMENT**

A The participants must:

(1) Place into the CRP for a period of 10 crop years from the date this contract is executed by CCC the acreage of eligible cropland specified in item 5 of Form CRP-1 and the conservation plan, implement the conservation plan developed for such land, and carry out the terms and conditions of this contract;

686

(2) Implement the conservation plan in accordance with the schedule of completion dates included in the conservation plan (the COC may grant an extension of time for implementation of the conservation plan if, as determined by COC, the delay in implementation was caused by conditions beyond the participant's control);

(3) When required by the conservation plan or the COC, establish a temporary vegetative cover to control soil erosion until permanent vegetative cover can be established;

(4) Maintain the vegetative cover and the required conservation practices on the CRP land and take other actions that may be required by CCC to achieve the reduction in erosion necessary to maintain the production capability of the soil throughout the contract period;

(5) Reduce the aggregate total of crop acreage bases, allotments, and quotas for the contract period for each farm based on a ratio between the acreage of CRP land and the total cropland acreage on such farm in accordance with instructions issued by CCC;

(6) Not knowingly or willingly allow grazing, harvesting, or other commercial use of the forage from the CRP land except as may be specifically permitted by the CCC in response to a drought or similar emergency;

(7) Not harvest or sell, nor otherwise make commercial use of trees on the CRP land including the shearing or shaping of trees for future use as Christmas trees (the participants may conduct pruning, thinning, stand improvement, or other activities consistent with customary forestry practices on land that is planted to trees);

(8) Not produce any agricultural commodity on converted wetland or on highly erodible land except insofar as production of such commodities may be permitted in accordance with 7 CFR Parts 12, 1940, 1941, 1943, 1945, and 1980;

(9) Comply with the terms and conditions applicable to commodity certificates;

(10) Comply with the noxious weed laws of the applicable State or subdivision thereof on CRP land;

(11) Not undertake any action on land under the participant's control which tends to defeat the purposes of this contract, as determined by CCC;

(12) Annually file Form ASCS-578 for the farm with the COC, accurately listing all crops and land uses on the farm which form shall be filed not later than the final reporting date determined and announced by the Administrator, Agricultural Stabilization and Conservation Service; and,

(13) Annually file required applicable forms for payment limitation determinations.

B CCC agrees:

(1) Subject to the availability of funds to:

(a) Pay to the participant an annual rental payment for a period of years not in excess of the contract period in the amount specified in item 6 of Form CRP-1 multiplied by the number of acres placed in the CRP by this contract except as provided in paragraphs 2I and 6C of this Appendix;

(b) Share the cost with the participant of establishing eligible conservation practices specified in the conservation plan at the levels and rates of cost-sharing determined in accordance with paragraph 5 of this Appendix except that in no case may the share of CCC exceed an amount equal to 50 percent of the current agricultural market value of the land placed in the CRP pursuant to this contract unless the Deputy Administrator for State and County Operations of the Department's Agricultural Stabilization and Conservation Service otherwise approves in writing on behalf of CCC; provided, further that such approval must specifically reference the land placed in the CRP under this contract; and

(c) Provide the participant with the technical assistance necessary to carry out this contract.

(2) At the time of contract expiration or cancellation, to reinstate the base, allotment, or quota, required to be reduced for participation in the CRP, subject to the regulations governing Federal farm programs except that in no case may such bases, allotments, or quotas exceed the amount that would have been applicable had there been no CRP contract.

4 CONSERVATION PLAN

A The conservation plan will include some or all of the following information and requirements:

(1) The vegetative cover to be established on the CRP land;

(2) A tree planting plan, developed in cooperation with the Forest Service, if trees are to be established as the vegetative cover on the CRP land;

(3) A schedule of completion dates for establishment of the vegetative cover on the CRP land;

(4) The level of erosion control which must be attained on the CRP land; and,

(5) Any other conservation practices required for the establishment or maintenance of the vegetative cover on the CRP land.

B By signing the conservation plan, the participant agrees to implement the conservation practices specified in such conservation plan on the CRP land even if such conservation practices differ from those listed in item 10 and 15 of Form CRP-1, and in items 4 and 9 of Form CRP-1A Addendum.

5 COST-SHARE PAYMENTS

A Subject to the availability of funds, cost-share payments will be made available upon a determination by CCC that the eligible conservation practice, or an identifiable unit (component) thereof, has been established in compliance with the conservation plan.

B Eligible conservation practices are those practices specified in the conservation plan that meet all quantity and quality standards needed to establish permanent vegetative cover, including introduced or native species of grasses and legumes, forest trees, permanent wildlife habitat, field windbreaks, and shallow water areas for wildlife that will provide adequate erosion control for the contract period. Other conservation practices may be determined to be eligible for cost-share payments if such practices are required in the conservation plan to assure establishment of permanent vegetative cover.

C Cost-share payments will be made available only for the establishment or installation of an eligible conservation practice and only upon a determination by CCC that the eligible conservation practice, or an identifiable unit (component) thereof, has been established in compliance with the conservation plan. In order to receive cost-share payments, the participant, upon completion of the conservation practice, must file Form ACP-245 with the COC.

D Subject to the availability of funds, CCC will make cost-share payments available to the participant at the rate specified in items 12 and 17 of the CRP-1 (and items 6 and 11 of the CRP-1 Addendum). However, nothwithstanding any other provisions of this contract, CCC will not make cost-share payments for any amount in excess of (1) the amount specified in paragraph 3B (1) (b) or; (2) 50 percent of the actual or average cost of establishing the eligible conservation practice specified in the conservation plan as determined by the COC. The cost-share payment made to a participant may not exceed the participant's actual contribution to the cost of establishing the conservation practice.

E (1) Except as provided in paragraph 5E(2) of this Appendix, cost-share payments will not be made to the participant on the same acreage for any eligible conservation practices which have been previously established.

(2) Cost-share payments may be authorized for the replacement or restoration of conservation practices for which cost-share assistance has been previously allowed under the CRP only if:

(a) Replacement or restoration of the practice is needed to achieve adequate erosion control; and

(b) The failure of the original practice was not due to the lack of proper maintenance or other failure by the participant.

688

6 **ANNUAL RENTAL PAYMENT**

A Subject to the restriction on payments to foreign persons as specified in paragraphs 2I and 6C of this Appendix and to the availability of funds, CCC will make annual rental payments available to the participant in the per acre amount specified in item 6 of Form CRP-1 multiplied by the number of acres placed in the CRP.

B Subject to the availability of funds, the annual rental payments will be made after October 1 of each year of the contract period.

C The total amount of all annual rental payments made to a person must not exceed the maximum payment limitation of $50,000 per year in accordance with 7 CFR Parts 704, 795, and 1497. For this purpose, the term "person" shall have the meaning applicable to limitations on payments as provided for in those regulations.

7 **METHOD OF PAYMENTS**

Payments under this contract may be made by CCC in the form of cash, in-kind payments, commodity certificates, or other manner as provided in 7 CFR Part 770.

8 **REGULATIONS**

The following regulations found in Title VII of the CFR are incorporated in, and made a part of, this contract by reference.

A Part 13, Setoffs and Withholding.

B Part 704, CRP.

C Part 707, Payments Due Persons Who Have Died, Disappeared, or Been Declared Incompetent.

D Part 709, Assignment of Payment.

E Part 713, Acreage Reduction and Land Diversion Program.

F Part 718, Determination of Acreage and Compliance.

G Part 770, Commodity Certificates and Payment-In-Kind.

H Part 780, Appeal Regulations.

I Part 790, Incomplete Performance Based Upon Action or Advice of an Authorized Representative of the Secretary.

J Part 791, Authority to Make Payments When There Has Been a Failure to Comply With the Program.

K Part 795, Payment Limitation.

L Part 796, Denial of Program Eligibility for Controlled Substance Violations.

M Part 1403, Interest on Delinquent Debts.

N Part 1497, Payment Limitation.

O Part 1498, Foreign Persons Ineligible for Program Benefits.

P All other parts of the Code of Federal Regulations which are made applicable to 7 CFR Part 704 and this contract.

9 ***DIVISION OF PAYMENT***

A Each person listed in item 4 of Form CRP-1 must share in the annual rental payment based upon the share to which each participant has agreed as set forth in Form CRP-1.

B If the percentage shares are not indicated in item 4 of Form CRP-1 at the time the contract is executed, the parties agree that the percentage shares will be determined based upon the share in the agricultural commodity which the participant would have otherwise received had the crop been produced on the land placed in the CRP as determined by CCC.

C The participant agrees to provide fair and equitable treatment, in accordance with 7 CFR Part 713, with respect to producers on the farm which contains the CRP land.

10 **PROVISIONS RELATING TO TENANTS AND SHARECROPPERS**

No payment will be approved for the current year if CCC determines that any of the conditions specified below exist:

A The landlord or operator has not given the tenants and sharecroppers on the farm an opportunity to participate in the benefits of the program;

B The number of tenants and sharecroppers on the farm is reduced by the landlord or operator below the number of tenants and sharecroppers on the farm in the year before the current year in anticipation of, or because of participation in, the program, except that this provision will not apply to the following:

(1) A tenant or sharecropper who leaves the farm voluntarily or for some reason other than being forced off the farm by the landlord or operator in anticipation of, or because of participation in, the program; or

(2) A cash tenant, standing-rent tenant, or fixed-rent tenant unless:

(a) Such tenant was living on the farm in the year immediately preceding the current year, or

(b) At least 50 percent of such tenant's income was received from farming in the immediately preceding year.

C There exists between the operator or landlord and any tenant or sharecropper, any lease, contract, agreement or understanding unfairly exacted or required by the operator or landlord which was entered into in anticipation of participation in the program the effect of which is:

(1) To change the status of any tenant or sharecropper so as to deprive the person of any benefit or other right which such person would otherwise have had;

(2) To reduce inequitably the size of the tenant's or sharecropper's producer unit; or

(3) To increase the rent to be paid by the tenant or decrease the share of the crop or its proceeds to be received by the sharecropper.

D The landlord or operator has adopted any other scheme or device for the purpose of depriving any tenant or sharecropper of any benefits to which such tenant or sharecropper would otherwise be entitled. If any such conditions occur or are discovered after payments have been made, all or any part of the payments, as determined by CCC, must be refunded with interest and no further payments shall be made.

11 **ERRONEOUS REPRESENTATION AND SCHEME AND DEVICE**

A A participant who is determined to have erroneously represented any fact affecting a determination with respect to this contract and the regulations applicable to this contract and the CRP, adopted any scheme or device which tends to defeat the purposes of this contract or the CRP, or made any fraudulent representation with respect to this contract or the CRP will not be entitled to payments or any other benefits made in accordance with the CRP for which the representation was made and the participant must refund to CCC all payments received by such participant, plus interest and late payment charges thereon, with respect to the farm and the CRP and be subject to liquidated damages. Such liquidated damages will be determined in accordance with paragraph 15 of this Appendix.

B Refunds determined to be due and owing to CCC in accordance with this contract will bear interest at the rate of interest which CCC is required to pay for its borrowings from the United States Treasury as of the date of the disbursement by CCC for the monies to be refunded. Interest will accrue from the date of such disbursement by CCC. Upon sending the notification of the debt by CCC to the operator, interest charges will thereupon cease; however, the account will then bear late payment charges to be assessed every 30 days thereafter in accordance with the provisions of, and subject to the rates prescribed in, 7 CFR Part 1403 or any amendment or supplement thereto.

690

C The provisions of paragraph 11A of this Appendix shall be applicable in addition to any liability under criminal and civil fraud statutes, including 18 U.S.C. 268, 287, 471, 641, 1001; 15 U.S.C. 714m; and 31 U.S.C. 3729, or any other liability to which the participant may be subject.

12 **CLAIMS AND ASSIGNMENTS**

A Except as provided in paragraph 12B of this Appendix, any payment or portion thereof due any person will be made by CCC without regard to question of title under State law, and without regard to any claim or lien which may be asserted by any creditor, except agencies of the U.S. Government. Setoffs and withholdings for debts owed to agencies of the U.S. Government will be made in accordance with the provisions of 7 CFR Part 13.

B Any participant entitled to any cash payment may assign such payments in accordance with the regulations governing assignment of payment which are found at 7 CFR Part 709. Payments in other form may not be assigned.

13 **PARTICIPATION BY PARTNERSHIP**

If the participant is a partnership, no payment will be made to the partnership until the social security numbers or employer identification numbers of all members of the partnership are furnished to CCC, together with a listing of the beneficial interest of each member of the partnership.

14 **IRREVOCABLE OFFER**

A An offer to enter into the CRP will be presented on Form CRP-1 and may be submitted to CCC only during the announced signup period during which CRP contracts may be entered into with CCC.

B A person agrees by signing the CRP-1 that the CRP-1 and its addenda shall be considered an offer to enter into the Conservation Reserve Program on the terms specified on Form CRP-1 and its addenda. The offer, until revoked, may be accepted by CCC. The offer may not be revoked by the person siging the CRP-1 until 30 days after the end of the applicable signup period.

15 **LIQUIDATED DAMAGES**

It is mutually agreed that in the event the contract is breached by the participant, terminated because of some action or lack of action by the participant, or the person signing the CRP-1 fails to comply with the acceptance provisions of paragraph 14, the CCC will suffer substantial damages which are impossible to calculate. The purpose of the CRP is to control erosion on highly erodible lands thereby protecting the Nation's soil and water resources for succeeding generations. CCC and other segments of the agricultural community will act based on the assumption that this contract will be fulfilled and a reduction in erosion and production will be obtained. CCC's actions include budgeting and planning for the CRP in subsequent crop years. A participant's failure to comply with the terms and conditions of this contract undermines the basis for these actions, damages the creditability of CCC's programs with other segments of the agricultural community, and requires additional expenditures in subsequent crop years in order for the required levels of acreage to be placed in the CRP and in order for an adequate reduction in erosion to be obtained. If the participant fails to comply with the acceptance provisions of paragraph 14, CCC will adjust subsequent CRP requests and will have expended time and effort in compiling bid abstracts and statistical data and in considering the offer. Therefore, in addition to the other penalties, interest or damages due, for breach of contract prescribed in this contract, the participant or person submitting a CRP-1, agrees to pay an amount equal to the product obtained by multiplying: (1) 25 percent of the annual rental payment rate specified in item 6 on Form CRP-1 by, (2) the number of acres that are the subject of the contract, as liquidated damages and not as a penalty, if this contract is terminated by CCC in accordance with paragraph 18 of this Appendix or if the person fails to comply with the acceptance provisions of paragraph 14 of this Appendix.

16 **NOTIFICATION OF CHANGES TO TERMS AND CONDITIONS OF THE CONTRACT**

CCC agrees that, if any changes of any of the terms and conditions of this contract, including changes necessary to reconcile the conservation practices listed on the CRP-1 to those specified in the conservation plan, become necessary prior to the date that this contract is approved on behalf of CCC, CCC will notify the person signing the CRP-1 of such change and the person will be given 10 days from the date of notification in which to agree to the revised terms and conditions or to withdraw from the contract. The person signing the CRP-1 agrees to notify the COC of an intention to withdraw from the contract within 10 days from the date of the issuance of the notice and further agrees that failure to notify the COC will constitute agreement to the revised terms and conditions.

17 **CORRECTIONS**

CCC reserves the right to correct all errors in entering data or the results of computations in the contract.

691

18 **TERMINATION OF CONTRACT; JOINT LIABILITY**

A (1) If the participant fails to carry out the terms and conditions of this contract, CCC may terminate this contract.

(2) If this contract is terminated by CCC, in accordance with paragraph 18A, the participant will:

(a) Forfeit all rights to payments under this contract; and

(b) Refund all payments previously received together with interest and late payment charges as specified in paragraph 11B of this Appendix; and

(c) Pay liquidated damages in accordance with paragraph 15 of this Appendix.

B CCC may terminate this contract if the participant agrees to such termination and CCC determines that termination would be in the public interest.

C If the participants fail to carry out the terms and conditions of this contract but CCC determines that such failure does not warrant termination of this contract, CCC may require such participant to refund, with interest and late payment charges, payments received under this contract, pay liquidated damages, or require the participant to accept such adjustments in the payment as are determined to be appropriate by CCC.

D All signatories to the CRP contract regardless of payment share are jointly and severally liable for compliance with the terms and conditions of the contract and for all sums falling due CCC pursuant to the contract.

19 **ACCESS TO LAND**

All representatives of the Department shall have the right of access to CRP land and to examine any other cropland under the participant's control for the purpose of determining land classification and erosion rates and for the purpose of determining whether there is compliance with the terms and conditions of this contract.

20 **CONTRACT MODIFICATIONS**

A CCC, by mutual agreement with the participants, may modify this contract in order to:

(1) Decrease acreage placed in the CRP;

(2) Permit the production of an agricultural commodity during a crop year on all or part of the land subject to this contract; and

(3) Facilitate the practical administration of the CRP.

B The concurrence of the SCS and the CD are necessary when modifications to this contract involve a technical aspect of the participant's conservation plan.

C CCC may modify this contract to add, delete, or substitute conservation practices when:

(1) The installed conservation practice failed to adequately control erosion through no fault of the participants;

(2) The installed measure has deteriorated because of conditions beyond the control of the participants; or

(3) Another conservation practice will achieve adequate erosion control.

21 **TRANSFER OF LAND**

A (1) If a new owner or operator purchases or obtains the right and interest in, or right to occupancy of, the CRP land, such new owner or operator may become a participant to this contract with the same terms and conditions, including limitations on payments. The new owner or operator may refuse to become a successor-in-interest to the CRP contract and may, subject to CCC approval, offer to enter into a new CRP contract with CCC covering such transferred land if the eligibility provisions in paragraph 2A are otherwise met.

(2) If the new owner or operator becomes a participant in this contract, the new owner or operator assumes all obligations of the previous participant under this contract with respect to the transferred land.

692

(3) If the new owner or operator becomes a participant in this contract:

(a) Cost-share payments will be made to the participant who established the conservation practices as specified in this contract; and

(b) Annual rental payments to be paid during the fiscal year when the land was transferred will be divided between the new participant and the previous participant based upon the period of time, as determined by the COC, during the fiscal year during which such participants had control of the land.

(4) A new owner or operator of CRP land applying to succeed to a contract shall report in writing to the COC at the time of submitting this Appendix for approval: (1) any interest of any kind in the CRP land that is maintained by a previous participant including, but not limited to, any present, future or conditional interest, or reversionary interest, or any option, future or present, with respect to the CRP land; and (2) any interest of any lender in the CRP land where the lender has, will, or can obtain, irrespective of a voluntary transfer or foreclosure or other remedy for non-payment of debt, a right of occupancy in the CRP land or an interest in the equity in the CRP land other than an interest in the appreciation in the value of the land occurring after the loan was made.

B If a participant transfers all or part of the right and interest in, or right to occupancy to, the CRP land and the new owner or operator does not become a participant to this contract, this contract will be terminated on the affected portion of the CRP land and such participant will:

(1) Forfeit all rights to any future annual rental or cost-share payments with respects to the transferred acreage;

(2) Refund all payments plus interest as specified in paragraph 11b of this Appendix that have been made on the transferred land, except a portion of the cost-share payments may be retained if CCC determines that the established conservation practices have achieved desired conservation benefits for an acceptable period; and

(3) Pay liquidated damages to CCC as specified in paragraph 15 of this Appendix.

## 22 MISCELLANEOUS

A (1) No payment will be made to any participant who harvests or knowingly permits to be harvested for illegal use, marijuana or other such prohibited drug-producing plants on any part of the lands owned or controlled by such participant; and

(2) Any participant who is convicted under federal or State law of planting, cultivating, growing, producing, harvesting, or storing a controlled substance in any crop year will be ineligible for any payments during the applicable crop year, as determined by CCC, and for the four (4) succeeding crop years.

B In case of death, incompetency, or disappearance of any participant, any payment due will be paid to the participant's successor in accordance with the provisions of 7 CFR Part 707.

## 23 EFFECTIVE DATE AND CHANGES TO CONTRACT

A This contract is effective when signed by the owner of the land to be placed in the CRP, the operator or tenant (if the operator or tenant is to be a party to this contract), and an authorized representative of CCC. Except as provided in paragraphs 16, 17, 18, and 20 of this Appendix, this contract may not be revoked or revised unless by mutual agreement between the parties. Within the dates established by the COC, this contract must be signed by the owner of the cropland to be placed in the CRP and by all other participants.

B In the event that a statute is enacted during the period of this contract which would materially change the terms and conditions of this contract, the COC may require the participants to elect between acceptance of modifications in this contract consistent with the provisions of such statute or termination of this contract.

## 24 REGULATIONS TO PREVAIL

In the event of a conflict between the Regulations which are incorporated hereby in paragraph 8 and the terms of this Appendix, the provisions of the Regulations will prevail.



693

25 **RECEIPT OF ADDENDIX**

By signing below, the following owners, operators, and producers agree to the terms and conditions of the contract, including terms and conditions set forth in this Appendix. The signatories to this Appendix, other than those signatories wishing to succeed to the CRP contract, agree specifically to the provisions of paragraph 14 which prohibit, subject to liquidated damages, the revocation of an offer to enter into the CRP contract until 30 days after the end of the applicable signup period. Signatories to this Appendix wishing to succeed to an existing CRP contract agree and certify that there is no unreported interest, in any previous contract participant or lender, required to be reported by paragraph 21 A (4) of this Appendix.

[signature] Date 7/17/89

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

____________________ Date________

This program or activity will be conducted on a nondiscriminatory basis without regard to race, color, religion, national origin, age, sex, martial status, or handicap.

CRP-3 U.S. DEPARTMENT OF AGRICULTURE EXHIBIT B

Agricultural Stabilization and Conservation Service

** NOTICE REGARDING BID AMOUNT **

Coshocton County ASCS Office
724 S. Seventh Street
Coshocton OH 43812

August 8, 1989

Dear Mr. Cottrell,

This notice is to inform you that your bid under the 1990 Conservation Reserve Program (CRP) is within the Maximum Acceptable Rental Rate (MARR) established by the Secretary of Agriculture for this bid pool. However, it has not yet been determined whether other CRP eligibility criteria have been met, such as, eligibility of the land itself for enrollment in the program.

The Coshocton County ASC Committee has determined that the bid amount does not exceed the local prevailing rental rate for an acre of comparable land. The acreage for the program was measured at 415.0 with the bid at $ 65.00 .

Further, before the COC can approve a CRP contract for the acreage you offered under the 1990 CRP, the Soil Conservation Service (SCS) must develop a conservation plan approved by the Conservation District. So that we may continue to process your bid, you should continue to work with the SCS to obtain the required conservation plan for the acreage which is the subject of the bid. Your bid cannot be accepted without an approved conservation plan.

After the SCS has provided this office with an approved conservation plan, COC will send you a signed copy of the CRP contract, containing the number of acres contracted for, the rental rate per acre, the contract period, the annual rental payment, the conservation practices that must be carried out on the contracted acres and the approved conservation plan for the acreage offered in CRP. Included with the CRP contract is the addendum and appendix, if applicable.

Practices to be carried out under CRP may be started at this time, with the understanding that cost-share PAYMENT WILL NOT BE MADE if:

1 Practice is not included in the conservation plan, or
2 Contract is not approved by COC.

COC has until September 1, 1989, as provided by the contract, to accept your request to participate in the CRP. If at the end of that time a contract has not been approved, you will have the option of leaving your bid on file, modifying the acres offered, or withdrawing from the program.

Please contact this office if you have any questions regarding this program, 622-8087 or 8088.

Sincerely,

Loran F. Stutz

Loran F. Stutz,



711

Form Approved - OMB No. 0579-0013

U.S. DEPARTMENT OF AGRICULTURE
Soil Conservation Service

SCS-CPA-11B
(3-86)

PAGE 8 OF 8

# CONSERVATION PLAN
## SCHEDULE OF OPERATIONS

**NOTE** The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 522a). The authorities for requesting the information to be supplied on this form are: 16 U.S.C. 590a-f (Soil and Water Conservation); 16 U.S.C. 590h(b) (Agriculture Conservation); 16 U.S.C. 590p(b) (Great Plains); 30 U.S.C. 1236 et seq. (Rural Abandoned Mine Reclamation); 33 U.S.C. 1288 et seq. (Rural Clean Water); The Food Security Act of 1985, Public Law 99-198; and the regulations promulgated thereunder. The information requested is necessary for the development and implementation of a conservation, reclamation or water quality plan as the basis for satisfying program eligibility and compliance requirements, and for providing technical assistance and/or cost-sharing under the previously mentioned authorities. Furnishing this information is voluntary; however, failure to furnish correct, complete information will result in the withholding or withdrawal of such technical or financial assistance. The information may be furnished to other USDA agencies, the Internal Revenue Service, the Department of Justice, or other State or Federal law enforcement agencies, or in response to orders of a court, magistrate, or administrative tribunal.

| 1. NAME | 2. COUNTY | 3. STATE | 4. CONTRACT OR AGREEMENT NO. | 5. TOTAL ACRES UNDER CONTRACT |
|---|---|---|---|---|
| Jeffrey Cottrell | Coshocton | Ohio | | 324.9 |

| ITEM NO. | FIELD | PLANNED CONSERVATION TREATMENT (Record of Decisions) | ESTIMATED AMOUNT (UNITS) | COST BASIS | COST-SHARE RATE % | COMPLETION SCHEDULE AND ESTIMATED COST-SHARE BY YEAR (For Noncost-Share Items Show Units) 1990 | 19 91 | 19 92–99 | 19 | 19 | REF. NO. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | | **Total Cost-Share by Year:** | | | | $ 14903 | $ | $ | $ | $ | |
| | | **Total Contract Cost-Share:** $ 14903 | | | | | | | | | |

**NOTES:**

A. All items numbered in column 6 must be carried out as a part of this contract to prevent violation.
B. When established, the conservation practices listed in column 8 must be maintained by the participant at no cost to the government.
C. Enter total cost per unit in column 10 unless the method of cost-share is flat rate. When flat rate, enter the amount per unit to be paid to the participant.
D. All cost share rates in column 11 are based on average cost with the following exceptions:
AA = Actual costs not to exceed average cost.
FR = Flat rate.
NC = Non cost-shared.
AM = Actual cost not to exceed a specified maximum.
E. Modifications will be referenced by number in column 17.
F. By signing, the participant acknowledges receipt of this conservation plan including the SCS-CPA -11 and SCS-CPA-11B and agrees to comply with the terms and conditions hereof.

16

367

**18. CERTIFICATION OF PARTICIPANTS**

| SIGNATURE | DATE | SIGNATURE | DATE | SIGNATURE | DATE |
|---|---|---|---|---|---|
| | | | | | |

**19. REVIEWING OFFICIALS SIGNATURES**

| DISTRICT CONSERVATIONIST-TECHNICAL ADEQUACY CERTIFICATION | DATE | APPROVED BY (Signature of Conservation District Representative) | DATE |
|---|---|---|---|
| Timothy W. Holt | 9-5-89 | Knox Porteus | |

# MINUTES OF COSHOCTON COUNTY COMMITTEE

The COC met at 9:30 A.M., September 6, 1989

Max G. Mercer..............Chairman

James J. Shroyer.......Vice-Chairman

Glenn W. King................Member

Loran F. Stutz..................CED

The following subjects were discussed, and action as indicated was taken:

1. MINUTES

The COC approved minutes of August 7th as written and read.

2. NOTICES

The COC reviewed mail received from the State Office the past weeks, with discussion on low yield disaster and emergency feed.

3. CRP

CRP - Not eligible due to no soil loss.

| | |
|---|---|
| 1107 | Lois Lawko |
| 1440 | Juanita Preston |
| 1545 | John Wilson |
| 2119 | George Lewis |

The COC reviewed the following CRP application.

2251 - Jeff Cottrell, renter operator; Lucille Stuller farm, Coshocton property. The office was informed 9-5-89 Lucille Stuller is deceased. The committee recommend holding 10 year application. The land will be a probable estate until additional information is received from family parties. No action to be taken.



186

UNITED STATES DEPARTMENT OF AGRICULTURE
AGRICULTURAL STABILIZATION AND CONSERVATION SERVICE
COSHOCTON COUNTY ASCS OFFICE
724 S SEVENTH STREET
COSHOCTON OH 43812

October 4, 1989

Dear Mr. Cottrell,

Thank you for meeting with the County Committee October 4, 1:30 p.m.

The Regional Attorney for Commodity Credit Corporation has requested copies of leases. Also a copy of the will. Documents must be submitted thru Coshocton Co. ASCS forwarded to the Regional Attorney for review and opinion.

No opinion can or will be rendered until review of documents.

Sincerely,

Max E. Mercer
James J. Shroyer
Glenn W. King



302

UNITED STATES DEPARTMENT OF AGRICULTURE
AGRICULTURAL STABILIZATION AND CONSERVATION SERVICE
COSHOCTON COUNTY ASC COMMITTEE
724 S. SEVENTH STREET
COSHOCTON OH 43812

November 14, 1989

Jeffrey Cottrell
34395 CR 402
Warsaw OH 43844

Dear Mr. Cottrell,

The following has been received from the Regional Attorney.

Due to the death of owner Lucille Stuller, Farm No. 2251, it will be necessary for the following to sign the Conservation Reserve Contract and the accompanying information prior to County Committee approval.

1. Executors of estate of Lucille Stuller
2. Each heir that will acquire an interest in the land pursuant to the terms of Lucille Stuller's will.

These signatures will represent agreement to payment shares and all provisions of the Conservation Reserve Program. All parties earning a payment will be required to complete forms SF-1026 (sodbuster), CCC-502A (individual $50,000 pay limitation and eligibility).

In addition, the County Committee must be satisfied that a foreclosure by Equitable Life will probably not occur. Please provide documentation to present to the Committee for such decision on November 20, 1989.

The next County Committee meeting will be November 20, 1989 at 9:30 am at the ASCS Office, 724 S. Seventh Street. To be accepted in the Ninth C.R.P. period the above lien information is necessary by November 20th.

The signature of contract and accompanying forms must be signed by November 24, 1989.

Any questions, please contact the ASCS Office. Telephone 622-8087.

Sincerely,

Loran F. Stutz

Loran F. Stutz,
County Executive Director

cc: Attorney David Railsback
Vernon E. Rapp, District Director
Ohio State Office, Conservation Section

letters sent to Jeff Cottrell + Atty D. Railsback were certified



298

United States Department of Agriculture

Agricultural Stabilization and Conservation Service

Ohio State ASCS Office
540 Federal Building
200 North High Street
Columbus, Ohio 43215

November 22, 1989

Mr. Jeff Cottrell
34395 Co. Rd. 402
Warsaw, Ohio 43844

Dear Mr. Cottrell:

From your correspondence of November 16, 1989 you apparently still have some question about the process involved before ASCS can enter into a long term contract with a producer, and how information is obtained.

It is the responsibility of the local county executive director, his staff or our legal counsel to check the following areas before accepting a CRP contract:

1 The land must meet CRP eligibility requirements.

2 The producer/owner must have legal control of the land offered.

3 We must be certain that the land offered will be under your control for the life of the contract. In case of death of the owner/producer or, sale of the property, the new owner has the option to continue the contract. If the contract is not continued by the new owners, all payments must be repaid plus interest and liquidated damages.

In your case, Mr. Stutz and the county ASCS Committee had reason to believe you would not have control of the property for the life of the contract. The following information was used to reach this decision:

1 A county committeeman read in Mt. Vernon newspaper that your grandmother had passed away, leaving future ownership of the property in question.

2 Mrs. Stuller's son James, voluntarily came into the office and reported Lucille Stuller's death and further stated he had reason to believe he (James) was an heir apparent. As

ASCS



165

an heir and prospective co-owner, he stated he would not consent to entering into, or continuing, a CRP contract under the terms you propose.

3 Our legal investigation reveals that the property is carrying a mortgage in which payments are delinquent and future ownership and/or control by you is in doubt.

I feel Mr. Stutz and the county ASCS Committee had adequate basis to question whether the terms of the contract could be met. As long as such questions exist we are legally precluded from entering into a CRP contract.

I find no indication that Mr. Stutz or his staff breached your confidentiality. He merely fulfilled, but did not exceed, his authority to make the necessary inquiries to assure proper eligibility, control and ownership of the land offered for the CRP contract.

Sincerely,

DL

Dorothy L. Leslie
State Executive Director

CC: Loran Stutz, CED Coshocton COF
V. Rapp, DD
M. Giles, Conservation

SED:DLLeslie:bmc



lele

CCC-477 (11-14-89)

U.S. DEPARTMENT OF AGRICULTURE
Commodity Credit Corporation

County Office Address, and Telephone Number
COSHOCTON ASCS OFFICE (614)622-8087
STREET
OH 43812 0000

CONTRACT TO PARTICIPATE IN THE 1990 PRICE SUPPORT AND PRODUCTION ADJUSTMENT PROGRAMS

2. ST. & CO. 39-031 | 3. Farm Identification 2251

THIS CONTRACT, is entered into between the Commodity Credit Corporation (CCC) and the undersigned producers on the farm identified above for the 1990 crop(s) identified in column 4 which are designated by the operator/producer of the farm by entering "YES" in column 5 and/or 6, and initialing. The terms and conditions of the contract are contained in the appendix to the contract, entitled Appendix to CCC-477, and any addendum thereto. BY SIGNING THIS CONTRACT PRODUCERS ACKNOWLEDGE RECEIPT OF THE APPENDIX TO THIS CONTRACT, CCC-477 (APPENDIX). This program or activity will be conducted on a nondiscriminatory basis without regard to race, color, religion, national origin, age, sex, marital status, or handicap.

| CROP 4 | PARTICIPATING IN: ARP 5 | PARTICIPATING IN: DIVERSION 6 | DEF YIELD: REG 7 | DEF YIELD: ADD | ACREAGE BASE 1/ 8 | PAID DIVERSION ACREAGE 9 | SOYBEAN/SUNFLOWER SAFFLOWER ACREAGE 10 | PERMITTED ACREAGE 11 | ACRES FOR PAYMENT: CROP ACREAGE 12 | ACRES FOR PAYMENT: CU ACREAGE 13 |
|---|---|---|---|---|---|---|---|---|---|---|
| CORN | X INITIAL MKC | | 98 NI | | 278.2 | | | 250.4 | .0 | 230.4 |
| WHEAT | X INITIAL MKC | | 36 NI | | 54.0 | | | 51.3 | .0 | 47.2 |
| OATS | | | 47 NI | | 2.3 | | | 363.6 | | |

1/ The acreage base for any crop that is not listed is zero.

OPERATOR Name and Address ID NO. 296 76 4611
JEFFREY COTTRELL
34395 CR 402
WARSAW, OH 43844

| CROP | CORN | WHEAT | | | |
|---|---|---|---|---|---|
| ADV. PAYMT | Y DEF | Y DEF/Y NL | | | |
| % SHARE | ALL | ALL | | | |

Other Farms

Signature: Jeff Cottrell 100% Date: Mar. 15 - 1990

PRODUCER Name and Address ID NO. 280 48 9701
LUCILLE STULLER
7730 NEWARK RD
MT VERNON, OH 43050

CROP | ENTER PERCENTAGE SHARE
ADV. PAYMT | ************Shares for all crops are zero.************
% SHARE | 100% to Jeff Cottrell

Other Farms

Signature ~~Jeff Cottrell~~ X Nancy K. Cottrell Exec.

REMARKS:

Mr. Stutz,

The ground in question which Jeff Cottrell leases, is the same ground which he signed in the program which he has been paid for in past years.

Mrs. Cottrell Exec.
of Stuller Estate

Note: I previously sent you a copy of my authority.

4. CCC USE ONLY: Payment according to shares are approved. | CCC Representative's Signature Glenn W. King | Date 4/11/90



478

**CRP-1**
(02-21-86)

U.S. DEPARTMENT
Agricultural Stabilization and Conservation Service
Commodity Credit Corporation

# CONSERVATION RESERVE PROGRAM CONTRACT

C/D: 39-031-1

3. FARM NO. 2251

**NOTE:** *The following statements are made in accordance with the Privacy Act of 1974 (5 USC 552a): The authority for requesting the information to be supplied on this form is the Food Security Act of 1985, P.L. 99-198, and the regulations promulgated thereunder (7 CFR Part 704) and the Internal Revenue Code (26 USC 6109). The information requested is necessary for CCC to consider and process the offer to enter into a Conservation Reserve Program Contract, to assist in determining eligibility, and to determine the correct parties to the contract. The information may be furnished to other USDA agencies, IRS, Department of Justice, or other State and Federal law enforcement agencies, and in response to orders of a court, magistrate, or administrative tribunal. Furnishing of the Social Security Number (SSN) is mandatory. Furnishing all other information is voluntary; however, failure to furnish the correct, complete information requested will result in rejection of the offer to enter into the contract.*

THIS CONTRACT is entered into between the Commodity Credit Corporation (referred to as "CCC") and the undersigned owners and operators (referred to as "Owner" and "Operator", respectively) on the farm identified above (referred to as "Farm") for the fields and acres (referred to as "designated acreage") identified in Items 8-17 below and on the CRP-1A Addendum, as applicable. The Owner and Operator agree to place the designated acreage into the Conservation Reserve Program ("CRP") for a period of 10 crop years from the date the Contract is executed by the CCC. The Owner and Operator also agree to implement on such designated acreage the Conservation Plan developed for such designated acreage and approved by the applicable local conservation district based upon the conservation practices identified in Items 10 and 15 below and in Items 4 and 9 on the CRP-1A Addendum or such other conservation practices as are identified in the Conservation Plan and agreed to by the Owner and Operator. The Owner and Operator and CCC agree to comply with the terms and conditions contained in this Contract and contained in the Appendix to this Contract, entitled Appendix to CRP-1, Conservation Reserve Program Contract (referred to as "Appendix"). By signing below, each Owner and Operator acknowledges that a copy of the Appendix has been provided to the Owner and Operator and that the Owner and Operator has signed the last page of such Appendix which will be kept on file in the County Agricultural Stabilization and Conservation Service (ASCS) Office. By signing below, the Owner and Operator also agree to allow CCC a period of 30 days from the close of the applicable signup period to accept this Contract and agree to pay liquidated damages in an amount specified in the Appendix if the Owner and Operator do not allow CCC such 30-day period in which to execute this Contract.

## 4. OWNERS AND OPERATORS

| | NAME AND ADDRESS | SHARE | SSN | SIGNATURE | DATE |
|---|---|---|---|---|---|
| A. | OPERATOR NAME AND ADDRESS: Jeffrey Cottrell, 34395 CR 402, Warsaw OH 43844 | 100% | 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 | [signature] | 7/17/89 |
| B. | OWNER NAME AND ADDRESS: Lucille Stuller, 7730 Newark Rd, Mt. Vernon OH 43050 | 0 % | 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 | Lucille Stuller | 7/17/89 |
| C. | NAME AND ADDRESS | % | | | |
| D. | NAME AND ADDRESS | % | | | |

| 5. ACRES FOR CRP | 6. RENTAL RATE PER ACRE | 7. CONTRACT PERIOD FROM | TO |
|---|---|---|---|
| 450 Ac. | $ 65.00 | 1990 | 1999 |

| TRACT NO. 8 | FIELD NO. 9 | PRACTICE NO. 10 | ACRES 11 | RATE OF COST-SHARES 12 | TRACT NO. 13 | FIELD NO. 14 | PRACTICE NO. 15 | ACRES 16 | RATE OF COST-SHARES 17 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | 3-15-90 | See Back | | |
| | | | | | | [initials] | Withdrawl. | | |

| 18. ANNUAL PAYMENT | 19. CCC USE ONLY - *Payments according to approved.* | CCC REPRESENTATIVE'S SIGNATURE | DATE |
|---|---|---|---|
| | | | |



333

OPY

I cannot sign into the 0/92 program and continue on with my application with the 10 CRP according to Mr. Stutz. Due to the time of year and appeal process I am forced into signing into the 0/92 for tthe 1990 crop year.

Thank you,

[signature]

MAR. 15-90